IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

SHEILA BULLOCK,

               Plaintiff,

      vs.

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

              Defendant.

CASE NO. 1:22-cv-01038

DISTRICT JUDGE
Sara Lioi

MAGISTRATE JUDGE
James E. Grimes Jr.

**REPORT &
RECOMMENDATION**

      Plaintiff Sheila Bullock filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits and supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter was referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

## Procedural background

      In May 2020, Bullock filed an application for disability insurance benefits and supplemental security income, alleging a disability onset date of April 20, 2020,[1] and claiming that she was disabled due to osteoarthritis. Tr.

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

87, 188. The Commissioner denied Bullock's applications at the initial level and upon reconsideration. Tr. 118–26, 132–38. Bullock requested a hearing before an ALJ. Tr. 140.

In March 2021, an ALJ held a hearing at which Bullock and vocational expert George W. Coleman III testified. Tr. 32–68. In April 2021, the ALJ issued a written decision finding that Bullock was not disabled. Tr. 16–25. The ALJ's decision became final in April 2022, when the Appeals Council declined further review. Tr. 6–9; *see* 20 C.F.R. § 404.981. Bullock filed this action in June 2022. Doc. 1. She presents the following issue:

> Whether the Administrative Law Judge's decision is supported by substantial evidence when she did not properly evaluate Plaintiff's allegations pursuant to SSR 16-3p.

Doc. 8, at 1.

## Factual background

### 1. Personal and vocational evidence

Bullock was born in 1965 and was 55 years old on the onset date of her alleged disability. Tr. 87. She graduated from high school and attended one year of college. Tr. 213. Bullock previously worked as a medical records clerk and nursing assistant. Tr. 40–44.

*2. Medical evidence*[2]

*2.1. Bullock's right knee*

Imaging of Bullock right knee in July 2018 revealed meniscus tears, a cyst, and mild tri-compartmental osteoarthritis. Tr. 252–53. Later in July 2018, Donald Goodfellow, M.D., examined Bullock, who rated her pain at "level IX." Tr. 254. Dr. Goodfellow opined that Bullock was a good candidate for surgery. Tr. 257.

In September, Dr. Goodfellow performed an arthroscopic meniscectomy and excised the cyst in Bullock's knee. Tr. 258. At a follow-up five weeks later, Dr. Goodfellow noted that Bullock reported that she was "getting along well," and that although she had "only … a couple of" "physical therapy" "visits left" she felt that those couple would "be enough." Tr. 258. Bullock had returned "to work on a regular basis." *Id*. He opined that she was "progressing as expected." Tr. 269.

During a follow-up in January 2019, Bullock reported pain "in a somewhat different area" and swelling in her knee. Tr. 271. Dr. Goodfellow opined that Bullock's discomfort was "technically" caused by "early osteoarthritis of the patellofemoral joint." Tr. 274. He prescribed meloxicam to reduce swelling and recommended that she adjust her physical activities. Tr. 274.

---

[2]     This recitation of medical evidence is not intended to be exhaustive. Except when necessary to provide context, it is limited to the facts provided in the parties' briefs.

Van Warren, M.D., saw Bullock in February 2019. Tr. 275–79. Bullock rated the pain in her knee 10 out of 10. Tr. 275. Meloxicam did not help but walking and ibuprofen provided some relief. *Id*.. Dr. Warren prescribed etodolac and Topamax. *Id*.

X-rays taken in early March 2019, revealed "mild patellofemoral and medial femorotibial compartment osteoarthritis of both knees." Tr. 281, 284. Later in March 2019, Bullock had an appointment with two doctors, Tr. 281–85, during which she complained of pain in her right knee that she rated "10/10," Tr. 281. Bullock reported that her pain worsened while sitting. Tr. 281. She also admitted that she had only attended physical therapy once, in September 2018. *Id*. The doctors diagnosed "osteoarthritis and possible complex regional pain syndrome." Tr. 285. They prescribed physical therapy and emphasized its importance to improving her condition. *Id*. They also prescribed Vitamin C, Topamax, and a compound cream. *Id*.

Bullock saw Dr. Warren again in June 2019. Tr. 287–91. She reported that taking too much Topamax made her sleepy and that she had not purchased the previously prescribed cream. Tr. 287. An examination revealed tenderness but no "joint effusion," "preserved range of motion," and patellofemoral syndrome in Bullock's right knee. *Id*. Dr. Warren gave Bullock an injection to treat swelling. *Id*.

An x-ray in October 2019, revealed "[m]ild tricompartmental osteoarthritis right knee worst medially." Tr. 293. The reviewing radiologist's

4

impression was that Bullock had "mild right knee osteoarthritis similar to [what her] prior" x-ray revealed.[3] *Id*.

Bullock saw Dr. Warren again in mid-October 2019. Tr. 296. She reported pain while walking and sitting and that the injection he'd given her in June only relieved her pain for about two hours. Tr. 296. Bullock had normal range of motion, slight pain in her quadriceps, no joint laxity, and normal muscle strength. *Id*. Dr. Warren ordered an MRI and prescribed Toradol and ibuprofen. Tr. *Id*.

The MRI revealed that ligaments and tendons around Bullock's knee were all intact. Tr. 294–95. But the tear in her meniscus had worsened and the cyst was "markedly enlarged" to 7.9 centimeters. Tr. 294–95. The MRI also revealed "full-thickness … cartilage loss" and "diffuse low[-]grade chondral loss." Tr. 294–95.

Bullock met with Brian Victoroff, M.D., two weeks later. Tr. 300–03. He explained the results on Bullock's MRI and that her cyst's recurrence was not unusual. Tr. 303. Dr. Victoroff also offered Bullock treatment options, including surgery. *Id*. Bullock later opted for arthroscopic surgery, which Dr. Victoroff performed in late December 2019. Tr. 304.

---

[3]    Bullock misreads the report. Contrary to her brief, the report does not say that her knee was "worse than before." Doc. 8, at 4. It says that her osteoarthritis is "worst medially," which means that it was worst in the middle of her knee.

Bullock saw physical therapist Margaret Grassell three weeks later. Tr. 312–14. Bullock reported no post-operative complications, was "ambulat[ing] with [a] crutch," and "[e]levate[d]" her leg "for swelling." Tr. 312. She rated her pain as "0/10." *Id*. Grassell recommended that Bullock attend physical therapy once or twice per week, "for 10–12 visits," and rated Bullock's "potential to achieve rehab goals [as] good." Tr. 314.

Bullock saw Dr. Victoroff in late January 2020. Tr. 315, 328. He noted that she was "doing very well" and was not using pain medicine. Tr. 328, 332. Dr. Victoroff recommended that Bullock use crutches for 10 more days and then discontinue their use. Tr. 332.

Bullock entered a physical therapy appointment in early February 2020, without using crutches. Tr. 319. She denied experiencing pain and rated her pain as "0/10." *Id*. Under the heading "therapy diagnosis assessed," Bullock's therapists listed "decreased range of motion of right knee," "impaired gait and mobility," and "right knee pain." *Id*. It's unclear whether these matters were assessed previously or at the February 2020 appointment. *Id*. In any event, the therapists opined that Bullock "appear[ed] to be progressing toward her goals."[4] Tr. 320.

---

[4] In describing the facts, Bullock omits that at both the physical therapy appointments, she rated her pain at "0/10." *See* Doc. 8, at 5. She also omits that at the February appointment, she "appear[ed] to be progressing toward her goals." *Id*. Worse, Bullock asserts that she "was still on crutches" as of the February appointment. *Id*. But her physical therapists noted that she "entered the clinic *without* her crutches." Tr. 319 (emphasis added).

Bullock saw Dr. Victoroff again in March 2020. Tr. 323–27. She reported "a little bit of aching pain from her arthritis." Tr. 323. Dr. Victoroff observed "no joint line tenderness[,] very small effusion," and that Bullock's "incisions [had] all healed well," she had "good quadriceps contraction[, but] slight crepitus." Tr. 327. Dr. Victoroff prescribed aqua therapy for Bullock's "residual symptoms from arthritis." *Id*.

In June 2020, Bullock saw Dr. Warren again. Tr. 351. She complained of pain on the side of her right knee where the doctor located "a small bulge." R. 345. Bullock reported that although ibuprofen provided "some pain relief," it made her drowsy. Tr. 351. She reported that her right knee pain was worse "after prolonged sitting or … climbing stairs." Tr. 345. Dr. Warrens' examination revealed "preserved range of motion of [Bullock's] knees[,] … well-healed surgical scar[s, and]… no joint laxity. Tr. 345–46. Dr. Warren told Bullock to discontinue ibuprofen and prescribed Oxcarbazepine "as needed for pain." Tr. 346.

Bullock had a telephonic appointment with Dr. Warren in January 2021. Tr. 429–33. Bullock complained of "some continued musculoskeletal pain particularly involving [her] right knee." Tr. 429. This pain was worst when "lying in bed at night." *Id*. Dr. Warren instructed Bullock to "discontinue … oxaprozin" and "start nabumetone … as needed for pain." *Id*.

*2.2. Bullock's shoulder*

In May 2017, Bullock received a cortisone injection in her left shoulder after presenting with shoulder pain. *See* Tr. 420, 422. At a follow-up in June 2017, with John Shaffer, M.D., her shoulder "remain[ed] symptomatic with impingement on provocation." Tr. 421. Dr. Shaffer diagnosed tendinopathy, noted that the hoped-for improvement after the May 2017 injection had not materialized, and ordered an MRI. Tr. 421–22.

Following an MRI, Bullock saw Dr. Shaffer in July 2017. Tr. 417–19. Although her MRI revealed no rotator cuff tear, Dr. Shaffer opined that Bullock's presentation was consistent with rotator cuff tendinosis. Tr. 418. He also noted a degenerative acromioclavicular joint. *Id*. Dr. Shaffer diagnosed "chronic impingement with rotator cuff tendinopathy" and arthritis in Bullock's left shoulder and an associated joint. Tr. 418–19.

In late August 2017, Bullock had surgery on her shoulder. *See* Tr. 414. One month later, her "[w]ound [was] well-healed," she had "reasonably good pendulum range of motion," and her "neurovascular status remain[ed] intact." Tr. 413. Dr. Shaffer prescribed physical therapy. *Id*.

By November 2017, Dr. Shaffer noted that Bullock had "good arm elevation and no impingement on provocation" and her "neurovascular status remain[ed] intact." Tr. 410. He opined that she was "fit to return to work"

during the following week. Tr. 410. Dr. Shaffer instructed Bullock to continue physical rehabilitation to "achieve maximum benefit."[5] *Id.*

*State agency and other medical opinion evidence*[6]

In August 2020, state agency physician Dana Shultz, M.D., reviewed the medical evidence and determined that Bullock could perform a reduced range of light work. Tr. 91–93. Dr. Schultz opined that Bullock could occasionally lift or carry 20 pounds occasionally and could frequently lift or carry 15 pounds. Tr. 91. She also opined that Bullock was limited to standing or walking for no more than four hours and to sitting for six hours out of an eight-hour workday. *Id.* Dr. Schultz also opined that Bullock could not climb ladders, ropes, or scaffolds; could frequently stoop; and could occasionally climb ramps or stairs, balance, kneel, crouch, or crawl. *Id.* Dr. Schultz opined that Bullock had no manipulative limitations but reported that Bullock "should avoid all exposure to unprotected heights and heavy machinery." Tr. 92.

---

[5]     Unfortunately, although Bullock includes a discussion in the facts section of her brief about her shoulder, she omits the fact that she had surgery on it. *See* Doc. 8, at 6–7.

[6]     When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

In October 2020, upon reconsideration, state agency physician Elaine Lewis, M.D., affirmed Dr. Schultz's findings. Tr. 107–08.

*Testimonial evidence*

Bullock and vocational expert George W. Coleman, III, testified during the hearing in March 2021. Tr. 32–68. Bullock was represented by attorney Rachel Wilson. Tr. 30.

Bullock testified that in 2006, she worked as a hospital records clerk. Tr. 41. In 2010, she became a nursing assistant. Tr. 42–43. After a number of years in that position, Bullock returned to the records department in 2016. Tr. 44. In that capacity, she spent most of her time scanning physical records into digital copies. Tr. 45. At some point, weakness in her knees caused Bullock to fall, which resulted in her torn meniscus, discussed above. Tr. 45–46.

Bullock testified that she lives in a three-story residence and "stairs are really like a task for" her, which is a problem because laundry machines are in the basement. Tr. 49. She explained that had "been a problem lately … because of the fact that that knee is the knee that" she drives with. *Id.*

Bullock also explained that in "just this past week even shopping [was] starting to become a problem" due to long lines caused by the pandemic. Tr. 50. She stated that her right knee was "always" swollen. *Id.*; *see* Tr. 53. Bullock uses Icy Hot and a heating pad on her knee. Tr. 53. Propping her leg up on a bed or recliner provides her the most relief. Tr. 55. And pain in her knee "definitely" "affect[s] [her] sleep." *Id.*

10

Bullock's answers to questions were not always easy to follow. A question about how her knee affected her at work elicited a lengthy narrative that seemed to convey that Bullock's superiors failed to sufficiently accommodate her knee pain.[7] *See* Tr. 51–52. A later question about whether

---

[7]    Bullock said:

> Well the scanning is what the job that I had, so you had to do the scanning where you do the sitting for that. So scanning medical charts and things like that was what we were based on doing for eight hours. *So even with that, with my shoulder having the impingements, spurs removed from those, my shoulder has never extended the whole 100 degrees like it had before with my right shoulder because I'm just now maybe a little bit able to get some ability in it in last the last year that I've had that surgery, but that requires a whole lot of physical to the left arm as well.* So I just couldn't sit in the chair. And then management would not give me proper seating. They gave me these little office chairs that most of these offices give you now. They give you these little office chairs that don't give you enough cushion to keep you more comfortable in the desk setting. And then your desks are not adequate for you to sit up where you can kind direct yourself to it, your body I guess is what I'm trying to say. So I found myself standing up sometimes to work because that was the only way I could feel like my knee could get some type of relief. But then I had management who was always on me about leaving the area or doing, you know, too much out of your area to make it, you know, put a hard on me to look like you're goofing off. And it just started to affect me as far as write-ups because I was starting to, you know, lose production.

Tr. 51–52 (emphasis added).

(continued …)

Bullock had asked her doctor to write a prescription for a special chair or prop at work elicited a lengthy response that didn't quite answer the question. *See* Tr. 54–55. Bullock explained that because her pain medication made her "groggy," she couldn't take it at work. Tr. 52.

Vocational expert George W. Coleman, III, testified after Bullock. See Tr. 56–68. Because neither party mentions Coleman's testimony, there is no need to summarize it here.

### The ALJ's decision

The ALJ made the following findings of fact and conclusions of law:

> 1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.
>
> 2.  The claimant has not engaged in substantial gainful activity since April 20, 2020, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).
>
> 3.  The claimant has the following severe impairments: osteoarthritis of the bilateral knees and obesity (20 CFR 404.1520(c) and 416.920(c)).

---

Bullock says that "[s]he testified that she was having shoulder issues at work." Doc. 8, at 7. But she doesn't provide a supporting citation for this assertion. *See id.* Three sentences later, she cites page 52 of the record, which may be a reference to the emphasized language above. That language, however, doesn't support the assertion in Bullock's brief that "[s]he testified that she was having shoulder issues at work." The emphasized language instead merely reflects that because of her range of motion, which was improving a "little bit[,] … she just couldn't sit in the chair." Tr. 51–52. Because Bullock plainly did sit when performing her job, *see* Tr. 51–52 ("I found myself standing up sometimes to work"), I interpret her testimony to mean that she couldn't sit for an entire shift.

12

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; stand or walk 4 hours of an 8-hour workday, alternating positions every 30 minutes without being off-task; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally balance, kneel, crouch, and crawl; frequently stoop; and avoid all exposure to work in unprotected heights or operating dangerous moving equipment such as power saws and jack hammers.

6. The claimant is capable of performing past relevant work as a medical records clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from April 20, 2020, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. 18–24.

## Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

13

which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.
>
> 5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the

duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

## Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which"

the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

## Discussion

Bullock argues that substantial evidence does not support the ALJ's decision. Doc. 8, at 12. Bullock offers a series of criticisms that are most appropriately discussed in turn. But the bottom line is that none of her arguments enjoy record support. The objective medical evidence does not support Bullock's arguments. *See* Tr. 21. So the Court should reject them and affirm the agency's decision.

Bullock begins by noting that the ALJ determined that, "for the reasons explained [elsewhere] in [the ALJ's] decision," Bullock's testimony about "the intensity, persistence and limiting effects of" her symptoms was "not entirely consistent with the medical evidence and other evidence in the record." Tr. 21; *see* Doc. 8, at 12. "In particular," the ALJ added, Bullock's "allegations are out of proportion to the medical evidence and other evidence." Tr. 21; *see* Doc. 8, at 12. According to Bullock, her allegations "*are* consistent with the objective medical evidence," Doc. 8, at 12 (emphasis added), and the ALJ failed to "provide[] … articulation or support for her finding that [Bullock's] allegations

16

are out of proportion to the medical evidence and other evidence."[8] Doc. 8, at 12–13. Bullock is mistaken.[9]

As an initial matter, to the extent that Bullock merely argues that the evidence supports her argument, *see* Doc. 8, at 14–15, she ignores the standard of review. Under the applicable standard of review, if substantial evidence supports the ALJ's decision, it doesn't matter whether the evidence could also support Bullock's argument. *Jones*, 336 F.3d 469, 477 (6th Cir. 2003); *see* 42 U.S.C. § 405(g) (the Commissioner's "findings … as to any fact if supported by substantial evidence shall be conclusive"). But if Bullock is also arguing that substantial evidence does not support the ALJ's determination that her testimony was "not entirely consistent with the medical evidence and other evidence in the record" and out of proportion to the medical evidence and other evidence," Tr. 21, *see* Doc. 8, at 12, her argument fails.

Necessarily, Bullock's argument involves a comparison between her testimonial complaints and the medical evidence. The ALJ summarized Bullock's testimony, saying that she:

> testified that she has "constant" right knee pain and her right knee stays swollen "all the time." She cannot sit for long. Due to knee pain, she keeps her

---

[8]    Bullock challenges the reader by inserting, in the middle of her argument, a separate challenge to the ALJ's assessment of her "subjective allegations." Doc. 8, at 12. I'll turn to that argument next.

[9]    Although Bullock discusses in her statement of facts issues related to her shoulder, *see* Doc. 8, at 6–7, she does not contest the ALJ's determination that her "left shoulder tendinosis/tendinitis is a non-severe impairment," Tr. 19. So she's forfeited any argument related to her shoulder.

knee propped up on her bed or in a recliner. Her pain
negatively affects her sleep.

Tr. 21. Bullock offers no counter summary of her testimony, so this serves as

the basis for comparison with the medical evidence.

The ALJ reviewed Bullock's relevant medical evidence, which might

aptly be described as sparse. Tr. 21–22. Indeed, the most notable aspect of

Bullock's medical evidence is that her medical providers said very little about

how her knee might limit her going forward. Nonetheless, the record shows

that three weeks after her December 2019 surgery, Bullock was moving around

on a crutch and that she reported that she was pain free. Tr. 312. One week

later, Dr. Victoroff noted that she was "doing very well" and had stopped using

pain medicine. Tr. 328, 332. Shortly after that, she went to physical therapy

with crutches and again said she was pain free. Tr. 319. Bullock's physical

therapists opined that she "appear[ed] to be progressing toward her goals."  Tr.

320.

It's appropriate to pause here to note that if this evidence shows

anything, it's that Bullock's surgery was a success and that her recovery was

going well. So if Bullock's argument has any traction, it would have to find its

footing based on what happened next. But Bullock only offered evidence of

three more medical visits over the next ten months. And none of the evidence

from those visits comes close to showing that substantial evidence doesn't

support the ALJ's determination.

18

Take the March 2020 visit with Dr. Victoroff. During that visit Bullock reported that she had "a little bit of aching pain from her arthritis." Tr. 323. And he prescribed aqua therapy for these "residual symptoms." Tr. 327. But his examination—the evidence Bullock must necessarily rely on—revealed "no joint line tenderness[,] very small effusion," and that Bullock's "incisions [had] all healed well," she had "good quadriceps contraction[, and] slight crepitus." Tr. 327. This evidence doesn't come close to supporting Bullock's testimony of "constant" right knee pain and swelling or her claimed inability to sit for long periods or her alleged need to prop up her knee.

Next up is the June 2020 appointment with Dr. Warren. *See* Tr. 345–351. Here, Bullock complained of pain on the side of her right knee and said that this pain was worse "after prolonged sitting or … climbing stairs." Tr. 345. But Dr. Warren's examination—again, the evidence Bullock must necessarily rely on—revealed "preserved range of motion of [Bullock's] knees[,] … well-healed surgical scar[s, and]… no joint laxity." Tr. 345–46. So this evidence also doesn't come close to supporting Bullock's testimony of "constant" right knee pain and swelling or her claimed inability to sit for long periods or her alleged need to prop up her knee.

This leaves the January 2021 appointment with Dr. Warren, during which Bullock complained of "*some* continued musculoskeletal pain particularly involving [her] right knee," which was worst when "lying in bed at night." Tr. 429 (emphasis added). But Bullock registered this complaint during

a telephonic appointment and thus Dr. Warren did not examine her. Tr. 429–33. So there is no medical evidence from this appointment. And even taking her complaint at face value, having "*some* continued musculoskeletal pain," which was worst when she was "lying in bed at night," Tr. 429 (emphasis added), does not inexorably support her assertion of "constant" right knee pain and swelling or her claimed inability to sit for long periods or her alleged need to prop up her knee.

Bullock's medical evidence thus showed that after her surgery, in March 2020, Bullock's "incisions [had] all healed well," she had "no joint line tenderness[,] very small effusion," "good quadriceps contraction[, and] slight crepitus." Tr. 327. And in June 2020, it showed "preserved range of motion of [Bullock's] knees[,] … well-healed surgical scar[s, and]… no joint laxity." Tr. 345–46. Critically, the ALJ noted the absence of any evidence that Bullock "required or received frequent care for any medical condition." Tr. 23. The medical evidence is, on its face, inconsistent with Bullock's testimony. The ALJ's determination that Bullock's testimony about her symptoms was "not entirely consistent with the medical evidence and other evidence in the record," Tr. 21, is thus self-evidently correct.

Bullock next says that "the ALJ's analysis of [her] subjective allegations is flawed." Doc. 8, at 13. It's not clear what Bullock thinks is wrong with the ALJ's analysis. She observes that the ALJ "devote[d] one only short paragraph

20

to discussing [Bullock's] symptoms." *Id*. But she doesn't claim that the ALJ's summary misstated her testimony or omitted anything.

Bullock's *counsel*, however, says that Bullock "would have offered more testimony about her specific limitations, the impact her condition and how pain affects her daily activities, but the ALJ cut of[f] [her] counsel's questioning to take testimony from the vocational expert." Doc. 8, at 13. Even if an unsupported assertion in a brief were evidence—it's not, *Camaj v. Holder*, 625 F.3d 988, 992 n.3 (6th Cir. 2010)—counsel is mistaken. At the conclusion of Bullock's testimony, the ALJ said, "Ms. Wilson I'd like to move onto the vocational expert since she said - -." Tr. 56. Rather than object or attempt to make a proffer—something that an attorney would do if that attorney wanted to continue the attorney's examination—Bullock's counsel said, "okay." Tr. 56. There is no basis from this interaction to conclude that the ALJ cut counsel off. To the contrary, counsel's "okay" evidenced her agreement that it was appropriate to move on. There is thus no basis for Bullock's assertion that "the ALJ's analysis of [her] subjective allegations is flawed." Doc. 8, at 13.

Bullock also offers that "the findings in [the ALJ's] brief discussion actually support [Bullock's] allegations." Doc. 8, at 13. But the referenced "brief discussion" was the ALJ's summary of Bullock's testimony. *See id*. There were no findings. Effectively, Bullock is saying that the ALJ's summary of Bullock's testimony "actually supports" the testimony that the ALJ was summarizing.

This is circular bootstrapping and doesn't show that the ALJ's analysis was flawed.

Bullock also asserts that the ALJ failed to "articulat[e] or support … her finding that [Bullock's] allegations are out of proportion to the medical evidence and other evidence." Doc. 8, at 13. This assertion is meritless because it ignores the two pages that follow the ALJ's statement in which she fully articulated why Bullock's "allegations [were] out of proportion to the medical evidence and other evidence."[10] *See* Tr. 21–23.

Bullock next argues that the ALJ "failed to properly consider all relevant factors set forth in SSR 16-3p[] or otherwise sufficiently explain her reasoning." Doc. 8, at 15; *see* Social Security Ruling 16-3p Titles II And XVI: Evaluation Of Symptoms In Disability Claims Social Security Ruling 16-3p Titles II And XVI: Evaluation Of Symptoms In Disability Claims, 82 Fed. Reg. 49,462 (Oct. 25, 2017). Ruling 16-3p provides "a two-step process for evaluating an individual's symptoms." 82 Fed. Reg. at 49,463. At step one, the ALJ should "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id*. At step two, the ALJ should "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an

---

[10]    Bullock "argues that … the findings relied upon by the ALJ actually support [her] allegations of chronic pain." Doc. 8, at 15. But she doesn't say how. Even so, whether this is so is not particularly relevant in light of Bullock's failure to show that the ALJ's determination is not supported by substantial evidence.

individual's symptoms limit his or her ability to perform work-related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim." *Id.* at 49,464.

Here, the ALJ found that Bullock satisfied step one. She found that Bullock's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." Tr. 21. So the issue is about step two.

Under step two, the ALJ should consider the objective medical evidence and other evidence, including an individual's statements, medical sources, and non-medical sources. 82 Fed. Reg. at 49,464–65. And when "evaluat[ing] the intensity, persistence, and limiting effects of an individual's symptoms," the ALJ should consider the factors in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). *Id.* at 49,465. These factors are:

> 1. Daily activities;
> 2. The location, duration, frequency, and intensity of pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

> 7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id*. at 49,465–66.

According to Bullock, the ALJ failed to "address the[se] factors." Doc. 8, at 16. Bullock has seemingly ignored the ALJ's decision, which belies her argument.

The ALJ recounted the two-step analysis required by Ruling 16-3p. Tr. 20–21. So she was plainly aware of Ruling 16-3p. And after stating the analysis, she discussed the factors in Ruling 16-3p, albeit without specifically stating each factor. *See* Tr. 21–22. The ALJ recited Bullock's daily activities and Bullock's testimony about how her knee affected her. Tr. 21. She discussed Bullock's testimony about the location of her pain and its intensity and duration—"all the time." *Id*. The ALJ also discussed the "type, dosage, effectiveness, and side effects of [Bullock's] medication." Tr. 21–22. In doing so, the ALJ also discussed Bullock's treatment history and "measures other than treatment [the Bullock] uses or has used to relieve pain or other symptoms," such as the fact that Bullock "keeps her knee propped up on her bed or in a recliner."[11] Tr. 21–22. So the ALJ followed the requirements of Ruling 16-3p.

---

[11]    Even if the ALJ failed to consider all the Ruling 16-3p factors, Bullock's argument would still fail because "an ALJ is not required to analyze all seven factors." *Pettigrew v. Berryhill*, No. 1:17-cv-01118, 2018 WL 3104229, at *16 (N.D. Ohio June 4, 2018), *report and recommendation adopted*, 2018 WL 3093696 (N.D. Ohio June 22, 2018). Rather, it is sufficient that an ALJ "consider[s] the relevant evidence," *id*., which the ALJ did.

Two final points. First, Bullock implies that the ALJ merely made "a single, conclusory statement that '[her] statements about … her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent." Doc. 8, at 18. As already discussed, this sort of assertion does not withstand scrutiny or a review of the ALJ's decision.

Second, Bullock asserts that the fact that Dr. Victoroff prescribed her a disability placard card shows that "the ALJ's conclusions are not supported." Doc. 8, at 14. This assertion is meritless because the fact that a doctor has "order[ed] … a disability placard adds nothing to a finding of disability." *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: May 1, 2023

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)

25